## Seeds *versus* Kahler.

1. A married woman owned land which she farmed, her husband managing for her; he had long been insolvent and without credit; her credit was good. He purchased a horse for her and signed a note for the price, "John E. Seeds for Josephine Seeds." She received the horse and used it on the farm, and acknowledged her liability for its payment. The horse was seized for the husband's debt before it was paid for. In an issue on a sheriff's interpleader, *Held*, that whether he bought the horse for himself or for her, was a question for the jury.

2. Where a wife has separate estate and buys goods on its credit, she may hold them against the creditors of the husband.

3. To protect goods from the husband's creditors, it is incumbent on the wife to establish that their purchase was on the credit of her separate estate.

May 19th 1874. Before AGNEW, C. J., SHARSWOOD, WILLIAMS, MERCUR and GORDON, JJ.

Error to the Court of Common Pleas of *Huntingdon county*: No. 40, to May Term 1873.

This was a sheriff's interpleader, in which the issue was made up April 15th 1872, between Josephine Seeds, plaintiff and claimant, and August Kahler, defendant.

Executions had been issued at the suit of Kahler against John E. Seeds, the husband of the claimant. The sheriff, under the executions, levied on certain personal property as belonging to the husband. It was claimed by the wife, and on that claim the interpleader issue was framed.

On the 28th of February 1866, Hugh Seeds, the father of John E. Seeds, who had long been insolvent, conveyed to R. B. Petriken a tract of land known as the "Means Farm," in trust for the use of Josephine Seeds, wife of John E. Seeds, for her natural life; or, if she should survive her husband, for so long as she might remain his widow; she only, or such person as she might appoint, to receive the rents and profits, so that the same should not be under the control, or be liable for the debts, &c., of John E. Seeds, or of any future husband. By the deed, the trustee was authorized, with her consent, to sell the farm and buy other real estate, and to give a mortgage on it for $2000 to Hugh Seeds, and also to borrow money on mortgage from time to time for the improvement of the farm.

On the same day, Hugh Seeds, for the purpose of enabling Josephine Seeds "to use, occupy and enjoy the plantation" so conveyed; by writing, under his hand and seal, gave and delivered to Josephine Seeds "all the stock, horses, cattle, wagons, farming implements, goods and chattels mentioned in the schedule and inventory" annexed. The valuation of the goods was $1483.

Mr. Petriken having been at his own request discharged and other trustees who had been substituted having also been dis-

charged, John E. Seeds, the husband, on the 2d June 1870, was appointed the trustee.

The trustee, under his powers in the deed, sold the "Means Farm" and purchased the "Eden Farm," to be held under the same trusts.

Mrs. Seeds, with her husband and son, lived on the farms, and with their assistance she farmed these plantations. They aided her also in buying and selling. From the proceeds of these farms she paid Hugh Seeds the $2000 mortgage and other debts which had been contracted to the amount of $3000. She continued to buy and sell upon the credit which the title to the property conveyed her by her father-in-law and the farm bought in its place, gave her.

To April Term 1872, August Kahler, the defendant, issued two executions against John E. Seeds, and levied on all the stock, cattle and farming implements on the farm, and all the goods and household furniture in the house.

Amongst other property levied upon was a mare. The principal controversy was as to the ownership of this mare.

The case was tried August 20th 1872, before Dean, P. J.

John E. Seeds testified: "We bought the bay mare from August Kahler. We have not paid it, but intend to pay for it. It was bought for Mrs. Seeds for her use."

There was given in evidence, a note dated March 17th 1868, in favor of Daniel Keller, in consideration of the mare for $181. Signed, "August Kahler, John E. Seeds for Josephine Seeds."

Being shown to witness, he testified that it was the security given for the mare.

Other testimony, as taken from the notes of the official stenographer, was as follows:—

"Question. State how you came to buy that horse?

"Answer. Why, August Kahler bought it from Daniel Keller, and we went his bail on the note; and after he had the mare there at our place, and she was so wild he could not ride her; he got tired of her about a month after, and he got at us to buy her, and we got her of him, and we was to pay Keller for her.

"Q. Well, you acknowledged—your wife acknowledged her liability to pay that?

"A. Yes.

"Q. You gave this as bail to August for that mare?

"A. Yes.

"Q. August Kahler brought the mare then to your place?

"A. He brought her there, and got tired of her, and he got at us till we bought her, and we were just to pay Daniel Keller for the mare. We have not paid that yet, but we intend to pay for it.

"Cross-examined.—Q. With regard to the Kahler horse, when had Kahler bought it?

[Seeds *v.* Kahler.]

"A. He bought it at Daniel Keller's sale.

"Q. Did you not send August Kahler to buy that horse?

"A. No.

"Q. Had he means of his own to buy it with?

"A. Yes; I suppose he had.

"Q. Now, did not you fix any price to that horse before you sent him to Keller?

"A. No; I did not. There was no conversation between Kahler and I about that, because if we had wanted the horse I would have gone and got the horse myself; but when he fetched the horse there, he could not ride her; she was that fiery and mean that he was afraid to ride her, and he got us to buy her, and we done so. Billy Davis filled up that note; I signed that note—both the signatures.

"Q. That is Kahler's name?

"A. Yes; we signed it all at one time. This note was given a couple or three weeks after the sale.

"Q. Did he permit Kahler to take away this horse without giving any note?

"A. Yes, sir; he had taken her away and brought her to our place. Cannot tell the date of the sale, it was before the 1st of April.

"Q. Was not that note signed on that day?

"A. It might have been dated on that day, it was not signed on that day. I signed it at Davis's store, at Shaversville. Daniel Keller lived up the valley. I was not at the sale. The note was signed a few days after the sale.

"Q. He had bought the horse then just on his own credit, which was so good that they did not require any note before he took her away?

"A. I don't know how that was, but I saw Dan Keller at Shaversville, and says he, 'Tell August that I want security for that mare.' and I said, 'We will go his security for the mare,' and says he, 'The note is in at Jemmie Davis's, he has the note in his store.'

"Q. You say you went his security and you were to pay it?

"A. Yes, sir, he held the mare. It was his when we went his security."

August Kahler, defendant, testified: "John Seeds sent me to buy the bay horse; I was working for him at that time; he told me to buy the horse there; I was working before at Dan Keller's, and I knew the horse; he did not say how high I ought to go; he did not say anything about the price; Seeds did not know anything about the horse; his son Robert and I went to the sale; I bought the horse for Seeds; he sent me there to buy him; when the sale closed there was nothing said to me about giving a note (note shown to witness); that is my name; it was signed in John Seeds's house,

[Seeds *v.* Kahler.]

he was there; I don't know who brought the note there; Seeds told me to put my name here; I cannot read English and did not know what it was, and I afterwards did not know anything about it; I was never called upon for the payment of that note; John never said anything to me about his wife owning the farm; I left that horse at Seeds's; he never was my horse."

Josephine Seeds, plaintiff, testified: " I think Mr. Lytle did ask me that evening amongst the first questions, about signing a note in favor of August Kahler; I told him that if my name was there I suppose I had signed it.

" Q. Did you say you had authorized your husband to sign it, or did you deny it?

" A. No, sir, I did not deny it; I told him to do the best he could, and to do it all for the best; I did not refuse to pay Kahler, and did not set up for a defence that I was a married woman; I stated there that if I had signed them I intended to pay them; I did not ever refuse to pay them.

" Q. Were you present when August Kahler brought that mare home?

" A. I was at home, yes, sir.

" Q. State what took place when that mare came there?

" A. Well, I just said to him, ' Well, did you buy a horse?' he said, ' I did;' said I, ' What for?' said he, ' To ride and drive.'

" Q. State whether or not you and John afterwards bought that mare from Kahler.

" A. We did; I did not at any time hear John tell Kahler to go to Keller's to buy a horse."

The court, after instructing the jury as to the law in the case and referring to the evidence as to the other personal property, as to the mare said:—

" The defendant further urges that the claim of plaintiff to the bay mare purchased at Daniel Keller's sale has failed. You will remember the testimony of Kahler. He says, at John's request he went to the sale and bid for this mare for him, John E. Seeds; that he took her home and John bought her from him. You will remember what John and Mrs. Seeds testify. They say Kahler bought her, and they bought her from him; that Kahler gave his note, and they went his bail to Keller. It is not alleged that Kahler paid Keller, or that they paid Kahler. If the testimony of Kahler be believed, that he bought her for John, of course she is John's property. If Seeds and wife purchased her from Kahler jointly, she would still be subject to levy and sale for John's debts, unless the property was acquired afterwards by Mrs. Seeds, in one or other of the methods by which a married woman acquires title to property. It is not alleged that Mrs. Seeds bought and paid for this mare; that Kahler sold to her, or that she acquired this portion of the property in any other way than by a joint purchase

[Seeds *v.* Kahler.]

with her husband; therefore the evidence, it seems to us, fails to establish her claim to this mare, and we so instruct you. * * *

• " As to the bay mare bought at Keller's sale you will find for the defendant, whatever may be your verdict as to the other property levied on; and the products of the farm you will find for the plaintiff."

The jury found for the plaintiff specifically, a number of articles contained in the sheriff's levy, including some articles of furniture.

" And find for the defendant, the bay mare bought at Keller's sale, one corner cupboard, chairs, tables, and all household and kitchen furniture not above named as found for plaintiff included in the sheriff's levy."

The plaintiff took a writ of error and assigned for error, amongst other things, the parts of the charge above stated.

*R. M. Speer* and *R. B. Petriken,* for plaintiff in error.—Where the credit results from the ownership by the wife of valuable real estate, neither reason, justice nor public policy forbids her the benefit of it : Brown *v.* Pendleton, 10 P. F. Smith 421; Wieman *v.* Anderson, 6 Wright 311; Rush *v.* Vought, 5 P. F. Smith 438; Musser *v.* Gardner, 16 Id. 243; Bucher *v.* Ream, 18 Id. 426. The evidence was conflicting and should have been submitted to the jury : Flick *v.* Devries, 14 Wright 267; Welch *v.* Kline, 7 P. F. Smith 432; Earl *v.* Champion, 15 Id. 194; Tripner *v.* Abrahams, 11 Wright 220.

*S. T. Brown* (with whom was *P. M. Lytle*).—The evidence of plaintiff did not show that the mare was bought on the credit of her separate estate : Bucher *v.* Ream, 18 P. F. Smith 426; the question therefore should not have been submitted to the jury. Goods purchased on her personal credit are not her separate estate : Robison *v.* Wallace, 3 Wright 129.

Mr. Justice MERCUR delivered the opinion of the court, June 1st 1874.

The plaintiff in error was the unquestioned owner of the farm on which she and her husband resided. She was engaged in its cultivation. The jury has found that she owned the stock, farming implements and crops, upon it. Her husband acted as her agent in overseeing the farm, and in conducting her business generally. He had been for many years, prior to the purchase of the mare in question, and then was, notoriously insolvent. She had good pecuniary credit, he had none. The note given on the purchase of the mare of Keller, indicated upon its face, that her credit, not her husband's, was pledged for its payment. Whether her name was signed as surety or as principal, it professed to bind her only, and not him. Hence whether the purchase was made of the de-

[Seeds v. Kahler.]

fendant, as claimed by the plaintiff, or whether it had previously been made of Kéller for her husband, as the defendant testified, the fact remains that the husband signed the note in behalf of his wife. It is well settled that when the wife has a separate estate, and she buys property on the credit of that separate estate, she may hold it against the creditors of her husband: Wieman v. Anderson et al., 6 Wright 311; Rush v. Vought, 5 P. F. Smith 437; Brown v. Pendleton et al., 10 Id. 421; Musser v. Gardner, 16 Id. 242. It is not necessary that she shall have paid for it at the time of her purchase. She is not precluded from buying upon credit, provided it be upon the credit of her separate estate. It is incumbent upon her to establish the fact that the purchase was so made, to protect her title against the creditors of her husband. The fact is to be established by proof which satisfies the jury. As already shown, she had a separate estate; her husband had none. The question then is, was there sufficient evidence to leave to the jury to find whether the mare was purchased for the plaintiff and on the credit of her separate estate? Both the plaintiff and her husband distinctly testify that the purchase was made of the defendant some time after he had purchased from Keller. In answer to the direct question put to the husband whether it was bought for him or for his wife, he answered, "it was bought for Mrs. Seeds, for her use." He also testified that his wife acknowledged her liability to pay. This then was a ratification of his authority to bind her in the purchase. It is true, in the course of his testimony, he said, "we bought" and "we have not yet paid," but this language does not necessarily imply, that he and his wife jointly purchased. The language "we bought," or "we sold," is that which every wife and every child frequently uses in speaking of a purchase or a sale made by or for the husband and father. It is the familiar expression of every clerk in speaking of the business transactions of his employer. With fully equal reason and propriety may it be used by a husband who is acting as agent for his wife, without conveying the idea he is acting for himself.

It was for the jury and not for the court to put a construction on this language, yet the learned judge said to the jury "it is not alleged that Mrs. Seeds * * * acquired this portion of the property in any other way than by a joint purchase with her husband, therefore this evidence, it seems to us, fails to establish her claim to this mare, and we so instruct you." The testimony of the defendant that he did not sell the mare to the plaintiff, but purchased her of Keller for the husband in his own right, created an issue of fact for the jury. Under proper instructions the court should have submitted the evidence to the jury to find by whom, and on whose credit, the purchase was made. The learned judge therefore erred in directing the jury to find for the defendant as to the mare.

Judgment reversed, and a *venire facias de novo* awarded.